IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SUSAN ANN SANDS WEDEWARD,

                                 Plaintiff,

      v.

LOCAL 306, NATIONAL POSTAL
MAIL HANDLERS UNION,

                                 Defendant.

OPINION AND ORDER

13-cv-100-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      In January 2013, plaintiff Susan Ann Sands Wedeward brought suit against defendant Local 306, National Mail Handlers Union in state court, alleging that the Union had not done enough to represent her rights when she became disabled and could no longer work for the United States Postal Service in Madison, Wisconsin. Defendant removed the case to this court. After some lengthy skirmishing over the adequacy of the complaint, plaintiff filed a second amended complaint in September 2013, dkt. #15, that was sufficient to state a claim that defendant had breached its duty of fair representation to plaintiff in connection with her efforts to challenge her termination by the United States Postal Service and other matters.

      The case is now before the court on defendant's motion for summary judgment. Defendant contends that the undisputed facts show that it fulfilled its duty to plaintiff. Defendant is correct; nothing in the undisputed facts shows that it failed to carry out its

1

duty of fair representation to plaintiff. In fact, her response to defendant includes almost nothing about its alleged duty to represent her but focuses on her alleged disability, which is outside the responsibilities of the Union. Accordingly, judgment will be entered for defendant.

From the findings of fact proposed by the parties, I find that the following facts are undisputed.

UNDISPUTED FACTS

A. Challenge to Termination of Employment

As of August 2010, plaintiff Susan Ann Sands Wedeward was employed by the United States Postal Service, working at a Postage and Distribution Center in Madison, Wisconsin. At all times relevant to this action, plaintiff was a member of the bargaining unit represented by defendant Local 306, which is an affiliate of the National Mail Handlers Union.

Defendant has 14 branches, covering the larger postal service facilities within Illinois and Wisconsin. It is governed by an executive board and has local branches, such as Branch 5, which covers the Madison mail handlers. Each branch has its own branch president, elected by union members within the branch. In addition, most branches have a chief steward for each of the three tours of duty, as well as other stewards. Over the years, the Union and the Postal Service have been parties to a series of collective bargaining agreements that govern the terms and conditions of employment for postal

service employees. Employees needing assistance from defendant in connection with disciplinary action or contractual rights can receive it from the branch president, from a chief steward or any other steward.

The collective bargaining agreement allows disciplined employees to challenge their discipline through a grievance process that can be initiated by an employee or by the Union on behalf of an employee. Step One involves either a two-party discussion between a supervisor and the employee or between a supervisor and a Union representative or a three-party discussion involving the supervisor, employee and union representative.

Plaintiff sustained an injury at work in October 2006 that required her to be off work for a period of time. When she returned, she was on a light duty limitation and worked on Tour 1 doing hand stamping.

Sometime in or around August 2010, the manager of distribution operations at the Madison distribution center asked Joseph Endrizzi, a mail handler steward on Tour 1 to be present for a meeting to be held with plaintiff, involving a complaint over the moving of plaintiff's work desk. The matter was resolved. During the meeting the manager told plaintiff she would have to provide updated medical documentation supporting her light duty restriction. Plaintiff made no objection at the time, but after the meeting, she told Endrizzi that she had decided she should not be required to provide the documentation because she had provided information earlier showing she had a permanent disability and did not think it necessary to provide updated documentation. She did not ask Endrizzi for any help or advice and he took no action.

3

Sometime in late August or early September, the distribution operations manager told Endrizzi that plaintiff had not provided the requested medical documentation and would be transferred from her light duty assignment to her regular assignment unless she did so. The manager told Endrizzi that plaintiff would probably need a steward when she was reassigned. Endrizzi then spoke to another steward about the matter and both of them met with plaintiff and urged her to provide the documentation. Plaintiff continued to maintain that she did not need to provide the documentation and would not be doing so.

During the tour beginning September 18, 2010, the supervisor of distribution operations, Tracey King, told Endrizzi she had spoken to plaintiff and told her she would have to return to work on the machine she had worked on before her injury, that plaintiff had refused to return to work and that King either sent her home or plaintiff went home of her own accord.

Plaintiff did not return to work after September 19, although management sent her letters accusing her of being absent without leave. Branch 5 president Jane Spakoski filed grievances on plaintiff's behalf challenging not only the letters, but the requirement that plaintiff provide additional medical documentation and other matters. Plaintiff wrote the Union frequently, sending along copies of medical documentation and other material and letting it know that she had applied for Supplemental Security Income disability benefits and had obtained a letter from a new doctor, saying she would have to remain out of work because of her medical condition.

Endirizzi filed several requests for information with the postal service and obtained

documentation from management about its position and about its communications with plaintiff.  In January 2011, management told Endrizzi that it was going to conduct a "Day in Court" session for plaintiff, a process that occurs before formal discipline is issued and is intended to give the employee a chance to meet with management and respond to the claims against her.

The Day in Court session was held on January 21, 2011.  Endrizzi, plaintiff and Tracey King were present.  King reviewed the charges that plaintiff had been absent without leave, that she had failed to maintain a proper work schedule and that she failed to inform management of her physical situation.  Plaintiff said that she was disabled and could not work; King said she needed additional medical documentation from plaintiff. When plaintiff said she did not have that information with her, Endrizzi went back to the union office and returned to the session with copies of the documentation.  Despite this documentation, King said she would be issuing formal discipline.

Endrizzi told plaintiff to keep the Union informed of what was happening, particularly if she received a formal notice of discipline.  Endrizzi submitted another request for information requiring management to provide the discipline package involving plaintiff.

Shortly after February 17, 2011, Endrizzi received a copy of the Notice of Removal issued to plaintiff that day.  He began collecting additional information to challenge the removal and he spoke often to plaintiff.  He had several meetings with King to learn her version of what had happened when plaintiff had been sent home in the middle of her

5

September 18-19 shift.  He filed a timely grievance to protect plaintiff's rights under the collective bargaining agreement and reached agreements with management to extend the date of the Step One meeting to allow him to gather more information.

Endrizzi conducted the Step One meeting with King on March 25, 2011.  He presented the Union's view about the impropriety of the Notice of Removal, which was that plaintiff should not have been put in the position of either doing work she was physically incapable of performing, thereby risking an aggravation of her injuries, or going home and that the postal service had handled the situation improperly.  He told King the Union was demanding rescission of the notice of removal, with no record of the action to remain in plaintiff's file, full back pay for plaintiff from the date she was sent home through December 22, 2010, when her doctor provided a form stating she would have to be off work for an indefinite period because of pain and weakness and that she be made whole in all other respects.

Endrizzi's arguments were countered by King, who said that the Management of Division Operations had been trying to obtain the updated medical information from plaintiff for months and had ordered her back to her old job only when she refused to supply the documentation.  King took the position that plaintiff should have returned to work with the documentation and should have responded to the absent without leave notices the postal service had send her.  She offered a compromise: the Notice of Removal would be rescinded, the time off would be treated as a time-served suspension and plaintiff would have another opportunity to provided the necessary medical documentation

6

supporting a light duty assignment.

After the meeting, Endrizzi and the new Branch President, John Castagna, called plaintiff to explain the outcome of the meeting. Plaintiff said it was not acceptable: she was disabled and would never return to work and had applied for Soccial Security benefits and that the postal service should discharge her because she was unable to work and would be on permanent disability. Castagna and Endrizzi counseled plaintiff to reconsider her position because a discharge would affect other benefits rights she had and could affect her ability to return to work in the future if her condition improved and she wanted to return. They told plaintiff that if she was permanently disabled it would be better for her to leave the postal service on that basis rather than being removed for having been absent without leave. Eventually the three of them agreed that the Union would reject King's offer and would revert to its original position on relief for plaintiff.

Endrizzi prepared a standard grievance form in preparation for the Step Two proceedings. He consulted with Castagna about how best to help plaintiff, knowing that the case would be difficult because plaintiff had not come to work since being sent home in September 2010, she had refused to provide further documentation as requested, she had not maintained contact with management and she had not responded to any communications from management. In their opinion, the best option for plaintiff was to obtain the disability benefits she was seeking and take a disability retirement from the postal service, thereby avoiding a forfeiture of certain benefits and keeping her work record clean in the event she was able to work in the future. In May 2011, Endrizzi reached an

7

agreement in writing with the postal service's Step Two designee to hold the case in abeyance pending resolution of plaintiff's disability claim, with the right of either party to remove the case from abeyance at any time.

In August 2011, Endrizzi learned from plaintiff that her disability claim had been denied by the Social Security Administration initially and on reconsideration. He received a letter from management's Step Two designee saying that he was removing the grievance from abeyance in light of the denial of plaintiff's disability claim and would deny it. The formal denial issued on September 16, 2011.

Endrizzi then prepared the corrections and additions form required to continue the grievance and the appeal process. He sent a copy to the management representative and another copy to defendant's Chciago headquarters, along with other material. When a grievance is advanced to Step Three, it is standard practice for the local Union president to make the final decision, after the local vice president has reviewed the file, analyzed the case and made a recommendation. In this case, the local vice president reviewed the available information and determined that plaintiff's case would be a difficult one to win. However, after consulting with the local branch president, Castagna, she recommended to the local president that the case go forward in the hope that the result would be a settlement that would allow plaintiff to leave on a disability retirement rather than under a notice of removal. Such a result would be advantageous for plaintiff in terms of benefits and her eligibility for future employment. The local president followed the advice and directed that the case advance to Step Three, advising the National Union Regional

8

Coordinator to try to negotiate the best settlement possible. The postal service denied the grievance at Step Three.

The local vice president then recommended certification of the case for arbitration in the hopes that doing so would persuade management to settle. The local president followed the recommendation.

The case was assigned to an arbitration advocate and scheduled initially for a hearing on April 1, 2012. It was rescheduled to be heard on October 7, 2013 for various reasons, including the unavailability of the arbitrator at that time and his later retirement, the expiration of the governing contract and the negotiation of a new one. The new arbitrator spoke with Endrizzi and Constagna on several occasions in preparation for the hearing. He told them to advise plaintiff that he would have to talk with her as the hearing date drew closer and that she would have to appear at the hearing. Endrizzi and Castaga talked to plaintiff to advise her of the date of the hearing and of the need for her to assist in the preparations for the hearing as well as to be present for the hearing itself.

On September 27, 2013, plaintiff wrote to defendant's Branch 5 office, asking it to withdraw from representing her, stating that the matter would have to be handled in court. She added that she had written to defendant's lawyer to tell him that the arbitration would have to be canceled because of the court proceedings. Castagna talked to defendant's president about plaintiff's letter. They concluded they could not continue to arbitrate plaintiff's case if she did not want them to, however mistaken they thought she was. Castagna sent plaintiff a certified letter, giving her one more chance to proceed to

9

arbitration. Although he received confirmation that the letter had been delivered to plaintiff's address and signed for, he never received a response from plaintiff. Defendant canceled the arbitration and took no further steps to represent plaintiff.

Defendant's records show that representatives had assisted plaintiff before 2010 in such matters as obtaining rescission of a disciplinary suspension, changing the designation of a time period originally designated as "absent without leave" to "leave without pay" so that there would be no disciplinary consequences and reducing the length of time that certain letters would remain in plaintiff's file for use in future disciplinary matters. In addition, defendant's representatives provided assistance to plaintiff by counseling her, advising her about the best ways of protecting her job and interceding with management and supervision on her behalf.

### B. Workers' Compensation Claim

When postal service employees are injured on the job, their recourse is to pursue their claims through the service's Office of Workers' Compensation Programs. This process is not covered by the collective bargaining agreement, so the Union plays no part in it. Instead, employees pursue claims for injuries on their own or with the assistance of a privately retained lawyer. They may consult with Union representatives for advice or assistance, but in those instances, the Union representatives are not performing an official union function.

OPINION

From the undisputed facts, it is clear that defendant Local 306 did not deprive plaintiff of her right to fair representation in her labor dispute with the United States Postal Service. To the contrary, the facts show that defendant made extensive efforts to assist plaintiff in challenging her termination from employment following the incident during her September 18-19, 2010 shift. Its representatives continued to do so despite plaintiff's adamant refusal to provide the postal service the additional, updated medical documentation it was seeking. Her refusal may have stemmed from frustration over the service's repeated requests for documentation she believed she had provided earlier. Whatever its roots, her refusal to respond to the requests stymied defendant's efforts to help her reach a favorable resolution of her employment dispute.

To the extent that plaintiff believes that she was denied fair representation because she did not receive the relief she wanted or because the process was an extended one, she is mistaken. Defendant's duty of fair representation does not require it to obtain whatever relief a member might be seeking. Its duty is far more limited. The test is whether it served the interests of all of its members "without hostility or discrimination toward any," exercised its discretion "with complete good faith and honesty" and avoided arbitrary conduct. Vaca v. Sipes, 386 U.S. 171, 177 (1967).

Plaintiff has not shown that defendant did not meet this standard. Indeed, it does not appear from her brief that she is even interested in pursuing her claim that defendant did not fulfill its duty of fair representation. Instead, she seems to have changed her focus

11

to defendant's failure to help her obtain disability benefits from the postal service. If so, she has no claim. She could not proceed on such an allegation because the Postal Service's workers' compensation program is not covered by the collective bargaining agreement between the service and the Union. Thus, defendant owed no duty to plaintiff to assist her in pursuing a claim for damages arising out of any injuries she suffered at work.

In summary, plaintiff has come forward with no evidence to suggest that she could put into dispute at trial defendant's showing that it acted toward plaintiff with good faith and honesty and carried out its duty to her without hostility or discrimination. Her failure to produce such evidence means that judgment must be entered against her. At the summary judgment stage, it is plaintiff's obligation "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Plaintiff did not make such a showing on an essential element of her case with respect to which she has the burden of proof. This means that defendant is entitled to a judgment as a matter of law. Id.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendant Local 306, National Postal Mail Handlers Union, is GRANTED. The clerk of court is directed to

enter judgment in favor of defendant and close this case.

    Entered this 16th day of July, 2014.

                                           BY THE COURT:
                                           /s/
                                           BARBARA B. CRABB
                                           District Judge

'